# EXHIBIT A
(Proposed First Amended Complaint)

Stephen Kelson, # 8458
   Steve.Kelson@chrisjen.com
Matthew K. Strout, #16732
   Matthew.Strout@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111-2047
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| DAVID ZAMORA and GUMECINDO ZAMORA<br><br>    Plaintiffs,<br><br>vs.<br><br>DOUGLAS QUEZADA, LAUREN QUEZADA, and HQC, LLC,<br><br>    Defendant. | **FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>Case No:<br><br>Judge: |

Plaintiffs, David Zamora and Gumecindo Zamora, by and through their undersigned counsel, hereby submit this First Amended Complaint and Jury Demand pursuant to 28 U.S.C. § 1332 and allege as follows:

**PARTIES**

1. Plaintiff David Zamora is a citizen of the State of California and resides in Ventura County.

2. Plaintiff Gumecindo Zamora is a citizen of the State of California and resides in Ventura County.

3. Defendant Douglas Quezada is a citizen of the State of Utah and resides in Utah County. As set forth herein, Douglas and the other Defendants defrauded Plaintiffs out of at least $136,800 in a fraudulent investment scheme and converted those funds for their own use and enrichment.

4. Defendant Lauren Quezada is a citizen of the State of Utah and resides in Utah County. She is the spouse of Defendant Douglas Quezada.

5. Upon information and belief, Defendant HQC, LLC's members consist of Douglas and Lauren. Since the citizenship of a limited liability company is based on the citizenship of its members, HQC is a citizen of Utah.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000. Plaintiffs are citizens of California, whereas Defendants are citizens of Utah.

7. This Court has personal jurisdiction over Douglas and Lauren because they are citizens of the State of Utah. The Court also has personal jurisdiction over HQC because its members are citizens of Utah, and they regularly make purchases, pay bills, transfer money, withdraw and deposit money, and conduct other transactions from the HQC bank account while in Utah.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District. In addition, a substantial part of the events or omissions giving rise to this lawsuit occurred in this District.

## GENERAL ALLEGATIONS

9. In or around November 2017, Defendant Douglas Quezada approached Plaintiff David Zamora about an "investment opportunity" in a company called Aurora Cannabis ("Aurora"). Douglas told David that he expected the stock price of Aurora to increase dramatically, and that David would profit handsomely if he invested. In fact, Douglas claimed that the market was so favorable that he was going to personally purchase shares in Aurora, and he urged David to take advantage of the opportunity as well.

10. Douglas, knowing that David knew little about investing, offered to purchase shares in Aurora for David and to manage an investment portfolio for him. All David had to do was transfer money to Douglas, and he would take care of the rest.

11. Douglas also asked David to relay his offer to David's father, Gumecindo Zamora. David did so.

12. David and Gumecindo trusted Douglas because they knew each other well and had been friends for approximately seventeen years. In fact, Douglas was David's and Gumecindo's bishop at the church they belonged to in California. In addition, Douglas portrayed himself as a savvy investor, and he claimed that he was making and managing investments for other individuals.

13. On December 1, 2017, David gave Douglas a Cashier's Check for $4,000 for the purchase and management of shares in Aurora. David did so in reasonable reliance on Douglas's representations, as set forth herein. As discussed below, David and Gumecindo paid Douglas at least an additional $136,800 for investment in Aurora over the next few years.

14. Douglas did not provide David or Gumecindo with any stock certificates, investment statements, or other documentation evidencing the purchase or performance of the stocks. Thus, in early 2018, David asked Douglas about the status of the investment. Douglas assured David that he had, in fact, invested the money on behalf of David and Gumecindo and was managing their investment. Douglas also stated that the stocks were a "long term investment" and that David and Gumecindo would not receive any dividends or other returns, and could not sell the shares, for two years.

15. Over the next three years, Douglas contacted David and Gumecindo at least eleven times to solicit funds from them for the purchase of additional shares in Aurora.

16. During each conversation, Douglas represented that the stocks were performing so well that Douglas was going to purchase additional shares for himself, and he invited David and Gumecindo to invest more through him. Like the initial investment, Douglas promised that he would purchase shares on behalf of David and Gumecindo and manage their investment portfolio. Douglas also reiterated in each conversation that David and Gumecindo "could not touch the money" for at least two years.

17. During at least one conversation, Douglas told David that if he and Gumecindo invested additional funds, Douglas would secure and insure their investment with gold from a Chilean mine that Douglas had an ownership interest in. Douglas explained that he did this as a courtesy to all of his high value clients.

18. Between February 2018 and January 2021, David and Gumecindo paid Douglas at least $132,800 to invest in Aurora. That sum was paid in twelve installments ranging from $3,000 to $15,000 each. Including the initial $4,000 payment and all subsequent payments, David and

Gumecindo paid Douglas at least $136,800 for investment purposes. The majority of the funds came from a bank account jointly held by David and Gumecindo. The remainder of the funds were paid from an account held by David. Out of the $136,800, $128,800 was paid by Cashier's Check. The remaining $8,000 was paid in cash.

19. David and Gumecindo made each payment in reasonable reliance on Douglas's representations as set forth herein.

20. Over the above-referenced three-year period, David and Gumecindo asked Douglas about the performance of their investment on ten or more occasions. Each time, Douglas claimed that their investment was doing well. From time to time, Douglas represented that their investment portfolio had increased in value by a specific amount. For example, on one occasion, he claimed that the portfolio gained $10,000 in capital appreciation.

21. All of Douglas's representations were false. He never invested the money on behalf of David and Gumecindo. Unbeknownst to David and Gumecindo, Douglas deposited the funds into the bank account of HQC, LLC, which is an entity owned or controlled by him and Lauren. Douglas and Lauren are authorized signers on the account, and they misappropriated the funds for their own enrichment at Plaintiffs' expense. More specifically, they each spent and utilized the funds for unauthorized personal and/or business purposes.

22. David and Gumecindo discovered that they had been defrauded in August 2021. During a phone call that month, Gumecindo mentioned to Douglas's brother, Diego, that he had invested money in Aurora through Douglas. Diego told Gumecindo that "you shouldn't have done that" and that Douglas "is robbing you."

23. After that conversation, Gumecindo asked Douglas to return the money he and David had paid for the non-existent stocks. Neither Gumecindo nor David asked Lauren for a refund because they were unaware that the money had been deposited into an account that Lauren and Doug jointly controlled, and they were unaware that Lauren had been spending and otherwise utilizing the money.

24. Douglas initially agreed to return $80,000 immediately and to return the remainder over time. However, during a subsequent conversation, Douglas falsely denied that David and Gumecindo provided him with at least $136,800 to invest. Douglas claimed that they provided only $20,000, notwithstanding the bank records and cashier's check receipts that prove that claim to be false.

25. Douglas, Lauren, and HQC never returned any of the money. Nor did Douglas provide David and Gumecindo with any stock certificates, investment statements, or other documents showing that he purchased any shares in Aurora for them.

26. Defendants' misconduct constitutes common law fraud, securities fraud, conversion, unjust enrichment, and civil conspiracy. David and Gumecindo have suffered damages as a direct and proximate result of Defendants' unlawful and egregious misconduct, and they seek actual, consequential, and incidental damages; statutory treble damages; punitive damages; statutory attorneys' fees and costs; pre-judgment interest, post-judgment interest, and/or statutory interest; and all other relief this Court deems just and proper.

**FIRST CAUSE OF ACTION**
**(Fraud)**
**(Asserted against Douglas Quezada)**

27. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

28. As described above, Douglas fraudulently induced David and Gumecindo to pay at least $136,800 to him under the guise of an investment opportunity.

29. Douglas made numerous fraudulent misrepresentations to David and Gumecindo including, but not limited to, the following:

    a. That Douglas would purchase stocks in Aurora on behalf of David and Gumecindo and manage an investment portfolio for them;

    b. That Douglas had, in fact, purchased the stocks and was managing the portfolio;

    c. That the investment portfolio was doing well and gaining value;

    d. That the stocks were a "long term investment," and that David and Gumecindo would not receive any returns, and could not sell their shares, for at least two years;

    e. And that David and Gumecindo's investment was safe and would not lose value because Douglas would secure and insure it with gold from a Chilean mine that Douglas had an ownership interest in.

30. The foregoing were false statements of presently existing material facts. Douglas did not invest any of the money in Aurora (or in any other company) on behalf of David and Gumecindo, nor did he ever intend to. As a corollary, Douglas did not manage the non-existent stocks or secure them with gold, and his representations about the performance of the non-existent stocks were fabricated. In addition, upon information and belief, Douglas did not own an interest in any gold mine.

31. For the same reasons, Douglas knew that his statements were false.

32. Douglas made the false statements for the purpose of inducing David and Gumecindo to transfer money to him, and to continue doing so after the initial payment. Douglas knew that David and Gumecindo would not gratuitously provide him with a large sum of money for his personal benefit. Douglas also knew that David and Gumecindo were not sophisticated investors. Douglas therefore created the ruse of an investment opportunity to separate David and Gumecindo from their hard-earned money.

33. Douglas falsely represented that he was managing the non-existent investment portfolio, which he claimed was appreciating in value, to give David and Gumecindo a false sense of security that Douglas was acting on their behalf and protecting their interests. Douglas also made that misrepresentation to dissuade David and Gumecindo from asking for documentation about the purchase and performance of the stocks, to prevent them from discovering that Douglas had misappropriated the funds, and to induce them to "invest" more money.

34. After David made the initial payment to Douglas, Douglas repeatedly told David and Gumecindo that the stocks had a two-year restriction. Douglas made that misrepresentation to further conceal his fraudulent scheme and to keep the cash from David and Gumecindo flowing. For the same reason, Douglas also falsely represented that the stocks would be secured by gold and were therefore risk free.

35. David and Gumecindo reasonably relied on the misrepresentations that Douglas made before and after Gumecindo made the initial payment. They had been friends for seventeen years, Douglas was their bishop when he resided in California, and he portrayed himself as a savvy investor who would protect the interests of David and Gumecindo, who were not experienced investors. In addition, Douglas told David and Gumecindo that he was making and managing

investments for other individuals, and that the market was so favorable that he was also investing his own money in Aurora. This created the façade of a legitimate investment opportunity, and David and Gumecindo had no reason to believe that Douglas, who was their friend and former church leader, would defraud them.

36. In short, David and Gumecindo trusted Douglas, and he abused that trust for his own enrichment.

37. David and Gumecindo have suffered damages as a direct and proximate result of Douglas's fraudulent misrepresentations. David and Gumecindo seek actual, consequential, and incidental damages in an amount to be proven at trial but no less than $136,800, as well as pre-judgment interest, post-judgment interest, and all other relief the Court deems just and proper.

38. In addition, David and Gumecindo are entitled to an award of punitive damages because Douglas engaged in willful, malicious, and intentionally fraudulent misconduct as set forth above.

## SECOND CAUSE OF ACTION
**(Securities Fraud Pursuant to Utah Code §§ 61-1-22(1)(a), 61-1-1(2), and 61-1-3(1))**
**(Asserted against Douglas Quezada)**

39. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

40. Pursuant to Utah Code § 61-1-1(2), "It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to: . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

41. Utah Code § 61-1-22(1)(a)(ii) creates a private right of action for violation of § 61-1-1(2).

42. As described above, Douglas made false statements of material fact to David and Gumecindo in connection with Douglas's multiple offers to purchase shares in Aurora, and to manage an investment portfolio, on their behalf. In addition, Douglas failed to disclose: (a) that he did not actually intend to purchase the shares, secure or insure them with gold, or manage an investment portfolio for David and Gumecindo; (b) that he did not have access to any gold that could secure any investment; (c) that he did not purchase the shares as promised; and (d) that the investment portfolio had not increased in value because it did not exist, among other things.

43. Utah Code § 61-1-3(1) provides that it is "unlawful for a person to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter." A private right of action is available for violation of that subsection pursuant to Utah Code § 61-1-22(1)(a)(i)(A).

44. Douglas transacted business as a broker-dealer or agent because he: (1) offered to purchase shares in Aurora on behalf of David and Gumecindo; (2) offered to manage the investment on their behalf; (3) made representations to David and Gumecindo about the expected and "actual" performance of the stocks; and (4) accepted money from David and Gumecindo for the foregoing purposes.

45. Douglas is not licensed as a securities broker-dealer or agent.

46. David and Gumecindo have suffered damages as a direct and proximate result of Douglas's statutory violations. Pursuant to Utah Code §§ 61-1-22(1)(b) and 61-1-22(2), David and Gumecindo are entitled to recover the money that Douglas misappropriated, interest at the rate of 12 percent per annum, and attorneys' fees and costs. They are also entitled to recover treble

11

damages under the above-referenced statute because Douglas's statutory violations were reckless or intentional.

### THIRD CAUSE OF ACTION
### (Conversion of Funds)
### (Asserted against all Defendants)

48. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

49. Defendants are liable for conversion of the $136,800 belonging to David and Gumecindo.

50. David and Gumecindo were entitled to immediate possession of the funds at the time of the conversion because the funds belonged to them.

51. Douglas willfully interfered with those funds without lawful justification because he misappropriated them. Specifically, the funds were provided to Douglas for the sole purpose of investing them in Aurora. Douglas did not use the funds for that purpose. Instead, he retained and used the money for his own benefit at the expense of David and Gumecindo without their knowledge or consent.

52. Lauren willfully interfered with David and Gumecindo's funds without lawful justification because she misappropriated them. Upon information and belief, she knew that the funds were provided to Douglas for the sole purpose of investing them in Aurora. She also knew that the funds had been deposited into the HQC bank account, which she is an authorized signer on. Despite that knowledge, she retained and used the money for her own benefit at the expense of David and Gumecindo without their knowledge or consent.

53. HQC, LLC also willfully interfered with David and Gumecindo's funds without lawful justification. The funds were deposited into HQC's bank account, and Douglas and Lauren,

who own or control HQC, misappropriated them for their own benefit and the benefit of HQC. Upon information and belief, they used the funds for both business and personal purchases and other transactions.

54. Defendants have refused and failed to return the misappropriated funds to David and Gumecindo.

55. Due to Defendants' conversion of the funds and their refusal and failure to return them, David and Gumecindo have been deprived of the use and possession of their funds.

56. David and Gumecindo have suffered damages as a direct and proximate result of Defendants' conversion, and they seek actual, consequential, and incidental damages including, but not necessarily limited to, an award of at least $136,800, prejudgment and post-judgment interest, court costs, and all other relief the Court deems just and proper.

57. David and Gumecindo are also entitled to an award of punitive damages because Defendants engaged in willful, malicious, and intentionally fraudulent misconduct as set forth in this Amended Complaint.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment/Quantum meruit)
### (Asserted against all Defendants)

58. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

59. Defendants received a benefit from David and Gumecindo, to wit: at least $136,800. Defendants knew that they received those funds, and they knew that David and Gumecindo paid those funds to invest in Aurora.

60. Defendants received and retained the funds under unjust circumstances. That is, Douglas's receipt and retention of the funds was the product of his fraudulent misrepresentations.

As explained herein, Douglas induced David and Gumecindo to pay him the funds by promising that he would invest them in Aurora, that the investment would be secured by gold, and that he would manage the investment, among other things. Douglas did not invest the funds, but rather misappropriated them for his own enrichment at the expense of David and Gumecindo.

61. Upon information and belief, Lauren and HQC knew that Douglas had induced David and Gumecindo to pay the funds through the above-referenced misrepresentations. They also knew that the money that was deposited into the HQC account belonged to David and Gumecindo, and that it was not theirs to spend. Despite that knowledge, they misappropriated the funds for their own enrichment at the expense of David and Gumecindo.

62. Defendants have been unjustly enriched, and David and Gumecindo are entitled to restitution; disgorgement of any other ill-gotten gains that Defendants received in connection with their unlawful conduct;; pre-judgement interest and post-judgment interest; court costs; and all other relief the Court deems just and proper.

63. In addition, David and Gumecindo are entitled to an award of punitive damages because Defendants engaged in willful, malicious, and intentionally fraudulent misconduct as set forth in this Amended Complaint.

## FIFTH CAUSE OF ACTION
**(Civil Conspiracy)**
**(Asserted against Douglas Quezada and Lauren Quezada)**

64. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

65. Douglas and Lauren Quezada engaged in a conspiracy to defraud Plaintiffs and misappropriate Plaintiffs' funds for their own benefit.

66. Douglas and Lauren committed multiple unlawful overt acts in furtherance of their conspiracy. As described above, Douglas induced Plaintiffs to pay at least $136,800 through multiple false promises that he would invest the money in Aurora, manage the investment for them, and secure it with gold, among other things. Instead of investing the money, Douglas deposited it into the HQC account, and he and Lauren took it for themselves and HQC.

67. A meeting of the minds to accomplish the foregoing is evidenced by the relationship of Doug and Lauren, their respective interests, their actions, and the sequence of events, among other things. Douglas and Lauren are spouses and apparent business partners, as demonstrated by the fact that they are both authorized signers on the HQC bank account. Thus, upon information and belief, Lauren knew about Douglas's fraudulent misrepresentations, and she knew that the funds Douglas deposited into the HQC account belonged to Plaintiffs. Despite that knowledge, Lauren and Douglas spent or otherwise utilized Plaintiffs' money as it came into the HQC account for their own purposes. Accordingly, upon information and belief, Lauren and Douglas had a meeting of the minds or an agreement that Douglas would obtain money from Plaintiffs under false pretenses, and that he would continue to do so for as long as possible, in order to wrongfully benefit and enrich Douglas and Lauren.

68. David and Gumecindo have suffered damages as a direct and proximate result of Douglas and Lauren's conspiracy. David and Gumecindo seek actual, consequential, and incidental damages in an amount to be proven at trial but no less than $136,800, as well as pre-judgment interest, post-judgment interest, and all other relief the Court deems just and proper.

69. In addition, David and Gumecindo are entitled to an award of punitive damages because Douglas and Lauren engaged in willful, malicious, and intentionally fraudulent misconduct as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

1. Judgment against Defendants for fraud, securities fraud, conversion, unjust enrichment, and civil conspiracy.

2. An award of actual, incidental, and consequential damages and/or restitution.

3. An award of statutory treble damages.

4. An award of punitive damages.

5. Statutory interest on the funds that Defendant Douglas Quezada fraudulently obtained from David and Gumecindo at the rate of 12 percent per annum and/or prejudgment and post-judgment interest.

6. Statutory attorneys' fees and costs.

7. All other and further relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable, and they rely on their jury demand in their original Complaint and the fee submitted therewith.

DATED: September 28, 2023

                              CHRISTENSEN & JENSEN, P.C.

                              /s/ Matthew K. Strout
                              Stephen Kelson
                              Matthew K. Strout
                              *Attorneys for Plaintiff*